CHARLES W. MILLER, as Assignee of the ELK FURNITURE COMPANY, Plaintiff, *v.* THE NATIONAL CHAUTAUQUA COUNTY BANK OF JAMESTOWN, Defendant.

Fourth Department, January 24, 1934.

*Brunstrom & Fletcher [Benjamin S. Dean* and *William H. Fletcher, Jr.,* of counsel], for the plaintiff.

*Ernest Cawcroft* and *Robert H. Jackson,* for the defendant.

THOMPSON, J. We have had submitted to us a controversy between an insolvent national bank and one of its depositors. The important question to be determined is as follows: Is the Bank Conservation Act (U. S. Code, tit. 12, § 207; 48 U. S. Stat. at Large, 3, chap. 1) enacted by the Congress of the United States on March 9, 1933, a valid and constitutional act?

The bank was in the hands of a conservator appointed by the Comptroller of the Currency, pursuant to the act. With the approval, authorization and consent in writing of depositors and other creditors of the bank representing upwards of seventy-five per cent in amount of its total deposits and other liabilities, as shown by the books of the National Banking Association, and stockholders owning at least two-thirds of its outstanding stock, as also shown by the books of the National Banking Association, a reorganization plan has been agreed upon, and adopted in accordance with the law. It has been approved by the Comptroller, and the Secretary of the Treasury has issued a license authorizing and permitting the bank to open and resume business. The plan provides, among other things, as follows: " Each depositor to be paid 50% of his net deposit as of March 6, 1933, in common stock, preferred stock and Certificates of Participation in the proceeds of such assets

of the bank as were excluded from the new bank by the Comptroller as not being sound banking assets.

" The remaining 50% of such net deposits as of March 6, 1933, to be paid to such depositors in cash on demand or to remain as deposits, at the option of the depositor."

The remainder of the plan is not before us.

The plaintiff did not approve, authorize or consent to the plan. It is conceded that the common stock, preferred stock and participation securities, to which plaintiff is entitled under the plan of reorganization, have been allocated to him and await his acceptance, and that fifty per cent of his net deposit, as of March 6, 1933, is posted in the bank to his credit, and is available to him irrespective of the decision to be reached here. Plaintiff has refused to accept such settlement and has demanded the payment of his deposit in full.

In view of the limitations contained in section 502 of chapter 1 (48 U. S. Stat. at Large, 7; U. S. Code, tit. 12, § 211, note) of the act, which reads as follows: " If any provision of this Act, or the application thereof to any person or circumstances, is held invalid, the remainder of the Act, and the application of such provision to other persons or circumstances, shall not be affected thereby," the factual nature of the dispute and the form in which it is submitted to us, we find that the only part of the statute, the validity of which is challenged, is section 207 of the Bank Conservation Act (U. S. Code, tit. 12, § 207). It is as follows:

" § 207. Reorganization; consent of depositors and creditors. In any reorganization of any national banking association under a plan of a kind which, under existing law, requires the consent, as the case may be, (a) of depositors and other creditors or (b) of stockholders or (c) of both depositors and other creditors and stockholders, such reorganization shall become effective only (1) when the Comptroller of the Currency shall be satisfied that the plan of reorganization is fair and equitable as to all depositors, other creditors and stockholders and is in the public interest and shall have approved the plan subject to such conditions, restrictions and limitations as he may prescribe and (2) when, after reasonable notice of such reorganization, as the case may require, (A) depositors and other creditors of such bank representing at least 75 per cent in amount of its total deposits and other liabilities as shown by the books of the national banking association or (B) stockholders owning at least two-thirds of its outstanding capital stock as shown by the books of the national banking association or (C) both depositors and other creditors representing at least 75 per cent in amount of the total deposits and other liabilities and stockholders

owning at least two-thirds of its outstanding capital stock as shown by the books of the national banking association, shall have consented in writing to the plan of reorganization: *Provided, however,* That claims of depositors or other creditors which will be satisfied in full under the provisions of the plan of reorganization shall not be included among the total deposits and other liabilities of the national banking association in determining the 75 per cent thereof as above provided. When such reorganization becomes effective, all books, records, and assets of the national banking association shall be disposed of in accordance with the provisions of the plan and the affairs of the national banking association shall be conducted by its board of directors in the manner provided by the plan and under the conditions, restrictions and limitations which may have been prescribed by the Comptroller of the Currency. In any reorganization which shall have been approved and shall become effective as provided herein, all depositors and other creditors and stockholders of such national banking association, whether or not they shall have consented to such plan of reorganization, shall be fully and in all respects subject to and bound by its provisions, and claims of all depositors and other creditors shall be treated as if they had consented to such plan of reorganization."

The act was passed in pursuance of a proclamation by the President declaring a national emergency, and is entitled "A bill to provide relief in the existing national emergency in banking, and for other purposes." The enacting clause recites, " Congress hereby declares that a serious emergency exists and that it is imperatively necessary speedily to put into effect remedies of uniform national application."

That the Constitution contains abundant authority giving Congress the power to enact all essential and reasonable law for the organization and functioning of banks was settled beyond dispute in *McCulloch* v. *State of Maryland* (4 Wheat. 316), which was decided by the Supreme Court of the United States in 1819.

" Its nature [the Constitution], therefore, requires, that only its great outlines should be marked, its important objects designated, and the minor ingredients which compose those objects be deduced from the nature of the objects themselves. * * *

"Although, among the enumerated powers of government, we do not find the word ' bank ' or ' incorporation,' we find the great powers to lay and collect taxes; to borrow money; to regulate commerce; to declare and conduct a war; and to raise and support armies and navies. The sword and the purse, all the external relations, and no inconsiderable portion of the industry of the nation, are entrusted to its government. * * * A government,

entrusted with such ample powers, on the due execution of which the happiness and prosperity of the nation so vitally depends, must also be entrusted with ample means for their execution. The power being given, it is the interest of the nation to facilitate its execution. It can never be their interest, and cannot be presumed to have been their intention, to clog and embarrass its execution by withholding the most appropriate means. * * *

" But the Constitution of the United States has not left the right of Congress to employ the necessary means; for the execution of the powers conferred on the government, to general reasoning. To its enumeration of powers is added that of making ' all laws which shall be necessary and proper, for carrying into execution the foregoing powers, and all other powers vested by this Constitution, in the government of the United States, or in any department thereof.' " (McCulloch v. State of Maryland, 4 Wheat. 407, 408, 411.)

Congress not only has power to organize banks, but it is seized with authority to pass requisite and appropriate laws looking to their integrity in soundness and operation. " The power of Congress to create, and, of course to continue, the bank, * * * is no longer to be considered as questionable," writes Chief Justice MARSHALL in the McCulloch case. Resting upon this authority, the Congress has passed numerous and varied laws designed to give strength and stability to national banks, and the Federal banking system, and their validity has been sustained by the courts. (Clement Nat. Bank v. Vermont, 231 U. S. 120; Davis v. Elmira Savings Bank, 161 id. 275.)

In pursuance of these powers, the Congress has also enacted laws providing methods for the liquidation of insolvent banks, which have been reviewed and approved by the courts. Laws conferring authority upon the Comptroller of the Currency to take possession of and liquidate insolvent banks, although the exercise of such powers involves the performance of judicial functions, are authorized by the Constitution. (Bushnell v. Leland, 164 U. S. 684.)

" It has been so often decided that the authority vested in the Comptroller to appoint a receiver of a defaulting or insolvent national bank, or to call for a ratable assessment upon its stockholders, is not open to objection because vesting that officer with judicial power in violation of the Constitution, that we have recently declined to re-examine that question." (Matter of Chetwood, 165 U. S. 443, at 458.)

If there be authority in the Federal Constitution for the enactment of laws for the salvaging, reducing to cash and the distribution

of the assets of an insolvent bank among the persons entitled to share in them, there must necessarily be sanction in that instrument for legislation looking to the conservation of such institutions and their continued operation.

" National banks  *  *  *. are instruments designed to be used to aid the Government in the administration of an important branch of the public service." (*Farmers' & Mechanics' Nat. Bank* v. *Dearing*, 91 U. S. 29.)

National banks are agencies of national government created by Congress to enable it to exercise and conduct its fiscal powers and operations.

The Congress may not pass an act which has for its object the taking of property without due process of law. (U. S. Const. Fifth Amendt.) It is claimed that the act we are examining violates the Constitution in this respect. If the act is " necessary and proper " in the light of the subject it treats, and the object it seeks, if it does not run contrary to fundamental principles of right and justice, or the rules and forms, which have been established for the protection of private rights, and if it is reasonable and not arbitrary, it is a valid exercise of the law-making power. ( *Kennard* v. *Louisiana ex rel. Morgan*, 92 U. S. 480; *Hurtado* v. *California*, 110 id. 516.)

We find the law reasonable. Every necessary precaution seems to have been taken and safeguard erected. The stockholder, the depositor and creditor all have a voice in making the plan, and whatever it may be, it fails without the approval of a large percentage of each. The plan must finally be approved by the Comptroller, who may impose added restrictions and conditions found requisite by him for the purposes of a sound and stable reorganization of the bank. The clear design of the law is not to permit the taking away or wasting of the property 'of the bank or its creditors but, as its title shows, conserve, preserve and continue it. If the liquidation powers given under the Banking Law authorize the reduction of the insolvent bank's assets to cash and their *pro rata* application to its debts, surely the conservation powers of the present act, which authorize the reorganization and continuance of the bank by the application of its assets to the end that the life of the bank may be preserved as an agency of the government, and the creditors saved in a measure from the losses which experience shows surely flow from liquidations in insolvency, are entitled to the same sanction. If there be power to salvage with loss, there is power to conserve although loss be entailed. We deem the legislation reasonable, as well as " necessary and proper," and not violative of the Fifth Amendment to the Constitution.

Moreover, the act is a valid and constitutional exercise of the power granted to Congress by the Constitution in its paragraph 4 of section 8 of article 1, which provides as follows: " The Congress shall have Power * * * 4. To establish * * * uniform Laws on the subject of Bankruptcies throughout the United States."

It is conceded that the bank was insolvent. There is no essential difference between bankruptcies and bank insolvencies. Each gives rise to the marshaling and liquidation of assets, the ratable distribution of the proceeds among creditors and the rehabilitation of the debtor.

" No distinction was ever practically, or even theoretically, attempted to be made between bankruptcies and insolvencies. And a historical review of the Colonial and State legislation will abundantly show that a bankrupt law may contain those regulations which are generally found in insolvent laws; and that an insolvent law may contain those which are common to bankrupt laws." (*Hanover National Bank* v. *Moyses,* 186 U. S. 181, 185, 186, 187.)

There is no significance in the fact that the Bankruptcy Act expressly excludes banks from the application of its provisions, or that the provisions of law directing the method of liquidation of insolvent banks are found in the Banking Law. In essence the liquidation provisions of the Banking Law are " Laws on the subject of Bankruptcies." The fact that another of the attributes of bankruptcy, to wit, the discharge of the debtor, is not present in the same form in the case of an insolvent bank is not a factor. There is no purpose in the discharge of a bank from its debts after liquidation. As matter of fact, it is then discharged because it has ceased to exist. There is a close analogy between the conservation and bankruptcy laws, in their composition provisions. By the terms of the Bankruptcy Act, a bankrupt may offer terms of composition to his creditors, which, if accepted in writing by a majority in number and amount of those whose claims have been allowed, and approved by the court, discharges him from his debts.

By the terms of the act here being examined, the insolvent bank is restored to solvency when depositors and other creditors representing at least seventy-five per cent in amount of the insolvent bank's total deposits, and other liabilities, consent in writing, and the plan of reorganization is approved by the Comptroller. In scope and content the two statutes are nearly identical. If one is valid, the other must be.

If there be sufficient virtue in equity to authorize the appointment of receivers of railroads and invest them with powers to issue emergency certificates of debt superior to antecedent debts of rail-

roads, and to operate them, on the plea that their public character and the public interest in their continuance and successful operation justify it (*Raht* v. *Attrill*, 106 N. Y. 423, 436), there must be power and authority in the Constitution and Congress to enact the law we are here considering, which, in practical and reasonable manner, fosters and protects the rights of depositors, creditors and stockholders of insolvent banks, and at the same time restores lost charters to important government agencies and enables them to resume the performance of essential public functions.

We have examined the provisions of the act of Congress under attack here with care and thoroughness, applying to it the tests of constitutional authority upon which its validity depends. In no respect do we find that it transcends or omits to conform to the provisions of the organic law. We, therefore, hold that it is valid and constitutional.

Lastly, in answer to the remaining question submitted to us, we hold that plaintiff's deposit in defendant bank was not made in pursuance of a court order, nor did the bank occupy any trust relation in reference to it. It was made by plaintiff, as assignee. In such case there can be no preference. (*Henkel* v. *Carnegie Trust Co.*, 213 N. Y. 185; *Matter of Egan*, 258 id. 334; *Matter of Bank of United States*, 261 id. 645.)

Let judgment be entered for defendant, without costs, on the stipulation.

All concur.

Submitted controversy determined in favor of the defendant, without costs.